# Exhibit A

# FILED

JAN 19 2017

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH.

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR SNOHOMISH COUNTY

| | |
|---|---|
| CITY OF EVERETT, a Washington municipal corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>PURDUE PHARMA, L.P., a Delaware limited partnership; PURDUE PHARMA, INC., a New York corporation; THE PURDUE FREDERICK COMPANY, INC., a New York corporation; and JOHN AND JANE DOES 1 THROUGH 10, individuals who are executives, officers, and/or directors of Purdue,<br><br>        Defendants. | Case No. 17 2 00469 31<br><br>**COMPLAINT** |

Plaintiff City of Everett ("Everett"), for causes of action against defendants Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and John and Jane Does 1 through 10 (collectively, "Purdue") alleges as follows:

## I.    SUMMARY

1.    For the benefit of the public, Everett seeks to hold Purdue — the manufacturer, seller, and promoter of OxyContin — accountable for knowingly, recklessly, and/or negligently supplying OxyContin to obviously suspicious physicians and pharmacies and enabling the illegal diversion of OxyContin into the black market, including to drug rings, pill mills, and other dealers for dispersal of the highly addictive pills in Everett.

COMPLAINT - 1

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

2.      Purdue's deceptive practices in the marketing of OxyContin are well-known and have resulted in a federal criminal guilty plea and numerous settlements with various states, including the State of Washington.  Following the revelations of Purdue's deceptive marketing practices, Purdue agreed to implement effective controls against the illegal diversion of OxyContin.

3.      Existing regulations also required Purdue to track suspicious orders and notify law enforcement if criminal activity was suspected.  Despite those regulations and Purdue's own agreement, however, Purdue continued to knowingly, recklessly, and/or negligently aid criminal activity in order to maximize its profits.

4.      For example, beginning in approximately 2008, a drug ring in the Los Angeles area engaged in a pattern of transparently false OxyContin orders, for the purpose of distributing OxyContin on the black market.  Purdue had both constructive and actual knowledge, and/or recklessly or negligently disregarded, that the orders facilitated by the illegal drug ring were not legitimate and that OxyContin was being diverted to the black market.  But Purdue took no action and instead continued to supply massive and disturbing quantities of OxyContin pills to the drug ring until it was ultimately shut down by law enforcement.  Put simply, Purdue knowingly, recklessly, and/or negligently supplied a Schedule II controlled substance to drug traffickers in order to generate enormous profits.

5.      In fact, for several years, Purdue collected, tracked, and monitored extensive data evidencing the illegal trafficking of OxyContin, including the dissemination of alarming quantities of pills through the drug ring in the Los Angeles area and (on information and belief) other clearly suspect physicians and pharmacies in Everett and other areas within the State of Washington.  Despite its obligations, however, Purdue intentionally, recklessly, and/or negligently failed to disclose such data to enforcement authorities or stop the flow of OxyContin into the black market.

6.      Purdue knew about (and/or recklessly or negligently disregarded) the suspicious

COMPLAINT - 2

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

orders from prescribing records, pharmacy orders, field reports from sales representatives, and Purdue's own surveillance operations. Purdue could have (and should have) reported and stopped the flow of OxyContin into the black market, including the prevention of illegal diversion through drug rings, pill mills, and other dealers in Everett, and (for example) the drug ring that operated in the Los Angeles area, which was "clearly diversion," and dispersed pills in Everett. But Purdue intentionally, recklessly, and/or negligently chose not to follow or implement the readily available and required measures, in order for Purdue to continue to reap large and obscene profits from its sales of OxyContin.

7.     As a direct result of Purdue's misconduct, huge quantities of OxyContin were disseminated from Purdue to drug rings, pill mills, and other dealers and into the black market within Everett. The resulting drug abuse, addiction, and crime caused by Purdue have imposed, and will continue to impose, sizeable costs on Everett, both social and economic.

8.     For example, Everett has spent, and will need to continue to spend, significant amounts of taxpayer dollars combating OxyContin abuse and addiction, including substantial costs for law enforcement, prosecution, emergency medical services, prisons and jails, probation, and public works. And nearly every department of Everett, from the fire department to the parks department, has been forced to devote substantial time, money, and resources to the harms caused by Purdue.

9.     In addition, Purdue's wrongful and tortious conduct also fueled a heroin crisis in Everett.

10.     The cost to remedy and remediate the extensive damage inflicted on Everett by Purdue is enormous. For example, significant and substantial sums are required to fund addiction treatment, detox and rehabilitation facilities, social services and housing, and prevention and education programs. Additional sums are also needed for law enforcement, diversion programs, and emergency medical services.

11.     In short, Purdue's improper actions of placing profits over the welfare of the

COMPLAINT - 3

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

1    citizens of Everett have caused and will continue to cause substantial damages to Everett.

2    Purdue is liable for its intentional, reckless, and/or negligent misconduct and should not be

3    allowed to evade responsibility for its callous and unconscionable practices. By this lawsuit,

4    Everett seeks to hold Purdue accountable for the benefit of the public.

5                                    **II.    PARTIES**

6           12.     Plaintiff City of Everett is a first-class city located in Snohomish County,

7    Washington, incorporated pursuant to Chapter 35.22 RCW, and duly organized and existing by

8    virtue of the laws of the State of Washington. Everett brings this action in its sovereign capacity

9    and for the benefit of the public, pursuant to the powers delegated by the State of Washington, in

10   the traditional sovereign function of providing for public safety, health, and welfare, and

11   recovering any other applicable forms of relief available for monetary damages and removal of

12   the public nuisance caused by Purdue.

13          13.     Defendant Purdue Pharma, L.P. is a Delaware limited partnership with its

14   principal place of business in Stamford, Connecticut. At all relevant times, defendant Purdue

15   Pharma, L.P. was in the business of manufacturing, selling, promoting, and/or distributing

16   OxyContin throughout the United States, including in Everett.

17          14.     Defendant Purdue Pharma, Inc. is a New York corporation with its principal place

18   of business in Stamford, Connecticut. On information and belief, defendant Purdue Pharma, Inc.

19   is the general partner of defendant Purdue Pharma, L.P. and supervised and managed its

20   operations. At all relevant times, defendant Purdue Pharma, Inc. was in the business of

21   manufacturing, selling, promoting, and/or distributing OxyContin throughout the United States,

22   including in Everett.

23          15.     Defendant The Purdue Frederick Company, Inc. is a New York corporation with

24   its principal place of business in Stamford, Connecticut. At all relevant times, defendant The

25   Purdue Frederick Company, Inc. was in the business of manufacturing, selling, promoting,

26   and/or distributing OxyContin throughout the United States, including in Everett.

COMPLAINT - 4

**KELLEY, GOLDFARB,**
**HUCK, ROTH & RIOJAS, PLLC**
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

16.     Defendants John and Jane Does 1 through 10 were executives, officers, and/or directors of Purdue at all relevant times, who knowingly, recklessly, and/or negligently supplied OxyContin to obviously suspicious physicians and pharmacies and/or enabled or failed to prevent the illegal diversion of OxyContin into the black market.

### III.    JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction by grant of authority under the Constitution of the State of Washington.

18.     Purdue is subject to personal jurisdiction in this Court pursuant to the long-arm statute for the State of Washington (RCW 4.28.185) and the Constitution of the United States based on at least the following:

a.     Purdue has substantial contacts with the State of Washington and has transacted substantial business in the State of Washington.

b.     On information and belief, Purdue promoted OxyContin to physicians and pharmacies in the State of Washington, including through sales visits to the State of Washington, despite actual knowledge and/or reckless or negligent disregard that the over-prescription of OxyContin would lead to abuse, addiction, and other harmful social impacts.

c.     Purdue committed tortious acts, including without limitation selling OxyContin pills with actual knowledge and/or reckless or negligent disregard that such pills would be illegally trafficked and abused, resulting in harm in the State of Washington.   Purdue also violated the law and regulations requiring the maintenance of effective controls against diversion and failed to design and operate a system to disclose suspicious orders of controlled substances, resulting in harm in the State of Washington.   In addition, Purdue violated its agreement, pursuant to a Consent Judgment entered in the State of Washington and governed by the laws of the State of Washington, to establish, implement, and follow an OxyContin abuse and diversion detection program consisting of internal procedures designed to identify potential abuse or diversion of OxyContin.

COMPLAINT - 5

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

d. Purdue knowingly, recklessly, and/or negligently supplied OxyContin to obviously suspicious physicians and pharmacies and/or enabled or failed to prevent the illegal diversion of OxyContin into the black market, including through drug rings, other dealers, and (on information and belief) physicians and pharmacies in Everett and other areas within the State of Washington.

e. On information and belief, Purdue has sold a significant number of OxyContin pills in the State of Washington and/or with intent, actual knowledge, and/or reckless or negligent disregard that such pills would reach the State of Washington, through channels both legal and illegal. Purdue further had actual knowledge and/or recklessly or negligently disregarded that its OxyContin sales would lead to abuse, addiction, and other harmful social impacts within the State of Washington.

f. Purdue's misconduct has caused actual injury in and to Everett, which injury occurred in the State of Washington.

g. On information and belief, Purdue has purposely directed its activities and has consummated numerous transactions involving OxyContin in the State of Washington, and/or has performed acts by which Purdue purposely availed itself of the privilege of conducting activities in the State of Washington, thereby invoking the benefits and protections of the law of the State of Washington.

19. Venue in this Court is proper because Everett resides in this County. Venue in this Court is also proper because, *inter alia*, Purdue transacts business in this County and/or transacted business in this County at the time the causes of action arose.

## IV. STATEMENT OF FACTS

### A. Purdue Aggressively Promotes and Deceptively Markets OxyContin by Manipulating Alleged Benefits and Minimizing Known Risks.

20. Oxycodone is an "opioid," which is a synthetic chemical derivative of opium. Oxycodone is chemically related to other opium-derived substances such as morphine, heroin, and hydrocodone.

COMPLAINT - 6

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

21.    Similar to other opioids, oxycodone is a potent analgesic, but it also has an extremely high potential to become addictive, particularly when used for extended periods. Oxycodone is, therefore, classified as a Schedule II narcotic under the Controlled Substances Act. Other Schedule II controlled substances include cocaine and methamphetamine.

22.    Even users who begin taking oxycodone under medical supervision and for a legitimate purpose are at risk of developing an addiction. Like other opioids, oxycodone is also illegally used as a recreational drug to achieve a euphoric state or "high." Users of oxycodone (both legitimate and illegitimate) build up a tolerance to the drug, requiring ever-larger doses to meet their needs, which also increases the risk of overdose and other complications.

23.    In the 1990s, Purdue patented, obtained FDA approval for, and commercially released OxyContin, an oral formulation of oxycodone. OxyContin was designed to gradually release its oxycodone content over an extended period of time, with the purported benefit of allegedly providing for a longer duration of pain relief than other oxycodone drugs.

24.    However, abusers of OxyContin quickly discovered that by minimally processing an OxyContin pill (such as by crushing it), the oxycodone content could be liberated for an intense short-term high. Since OxyContin had a higher total oxycodone content than formulations designed for immediate release, the potential for abuse and addiction posed by OxyContin was tremendous.

25.    Because it is an oral formulation of oxycodone, OxyContin is also designated as a Schedule II narcotic, and its manufacture and distribution is subject to regulation and control by the Drug Enforcement Administration ("DEA"), as well as a complement of state and local laws and regulations. Schedule II narcotics are defined as drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence. Schedule II narcotics, such as OxyContin, are also considered dangerous.

26.    Due to the risk of addiction and other dangers, OxyContin and similar opioid analgesics were traditionally prescribed for either a) acute pain issues requiring only a short

COMPLAINT - 7

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

duration of analgesic therapy (such as post-surgical pain), or b) cancer patients or other terminally ill individuals, for whom addiction risk was less significant.

27.     To expand the market for OxyContin, Purdue engaged in a campaign to exaggerate the benefits of and needs for OxyContin, while minimizing the known risks of OxyContin, including addiction, abuse, and diversion.  And to promote the sales of OxyContin, Purdue aggressively marketed OxyContin to physicians for broader use.  Purdue also deliberately misrepresented the effectiveness and addiction risk of OxyContin, both to the FDA, to physicians, and to the public via the drug's deceptive labeling.

28.     Although Purdue is a private, family-owned corporation, on information and belief Purdue has generated more than $30 billion from the sales of OxyContin.

**B.     Purdue Pleads Guilty to Federal Criminal Charges and Agrees to a Consent Judgment with the State of Washington.**

29.     In 2007, Purdue and several of its executives pled guilty to federal criminal charges that they misled regulators, doctors, and patients about OxyContin's risk of addiction and its potential to be abused.  Purdue admitted that certain statements about OxyContin were made to health care professionals that were inconsistent with the FDA-approved prescribing information for OxyContin and the express warnings it contained about risks associated with the medicine.  Purdue also acknowledged that it marketed and promoted OxyContin "with the intent to defraud or mislead."  To resolve criminal and civil charges regarding the mislabeling and deceptive marketing of OxyContin, Purdue agreed to pay fines and fees in excess of $600 million.

30.     Purdue was also sued in 2007 by several states, including the State of Washington. In its lawsuit, the State of Washington alleged that "Purdue engaged in unfair or deceptive acts or practices in its marketing, promotion and sale of OxyContin, including without limitation: a) aggressively marketing OxyContin to a broad variety of doctors and patients, for an ever expanding array of ailments, sometimes contrary to its label and indications, while failing to adequately disclose and reasonably warn of and guard against the health and safety risks

COMPLAINT - 8

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

associated with OxyContin, including the risks associated with misuse, abuse, dependence, addiction and diversion; b) avoiding or minimizing the known risks of OxyContin, including the risks of abuse, dependence, addiction and diversion; and c) employing a sales and incentive program that failed to reasonably guard against OxyContin abuse and diversion."

31.     Purdue ultimately agreed to pay $19.5 million as a multi-state settlement and also settled with the State of Washington pursuant to a Consent Judgment filed in the State of Washington.   In the Consent Judgment, among other obligations, Purdue agreed to enact safeguards to protect against the diversion of OxyContin.

32.     Specifically, Purdue agreed to "establish, implement and follow an OxyContin abuse and diversion detection program consisting of internal procedures designed to identify potential abuse or diversion of OxyContin in certain settings (the 'OxyContin Abuse and Diversion Detection Program'). The OxyContin Abuse and Diversion Detection Program will apply to Purdue employees and contract or third-party sales representatives, including Medical Liaisons, who contact practicing Health Care Professionals in person or by telephone for the purpose of promoting OxyContin. That Program directs those persons to report to the Office of the General Counsel situations, including, but not limited to the following examples, to the extent that such information or activities are observed or learned of by them: a) an apparent pattern of an excessive number of patients for the practice type, such as long lines of patients waiting to be seen, waiting rooms filled to standing-room-only capacity, or patient-prescriber interactions that are exceedingly brief or non-existent; b) an atypical pattern of prescribing techniques or locations, such as repeated prescribing from an automobile, or repeated prescribing at atypical times, such as after usual office hours when the Health Care Professional is not on call; c) information from a highly credible source or several sources (*e.g.*, pharmacists, law enforcement, other health care workers) that a Health Care Professional or their patients are abusing or diverting medications; d) sudden, unexplained changes in prescribing or dispensing patterns that are not accounted for by changes in patient numbers or practice type; e) a Health

COMPLAINT - 9

Care Professional who has a disproportionate number of patients who pay for office visits and dispensed medications with cash; f) multiple allegations that individuals from a particular practice have overdosed; or g) unauthorized individuals signing prescriptions or dispensing controlled substances."

33.     In the Consent Judgment, each of defendants Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc. also "warrant[ed] and represent[ed] that it and its predecessors, successors and assigns manufactured, sold and promoted OxyContin."

34.     Importantly, drug makers (like Purdue) are also required by federal law to alert the DEA of suspicious orders.  Pursuant to 21 U.S.C. § 823, manufacturers of controlled substances (such as OxyContin) are required to register with the DEA, and must demonstrate that their manufacture of such substances is in the public interest.   In determining the public interest, the DEA is required to evaluate, *inter alia*, "maintenance of effective controls against diversion," "compliance with applicable State and local law," "prior conviction record of applicant under Federal and State laws," and "past experience in the manufacture of controlled substances."

35.     The DEA has also promulgated regulations which require any manufacturer or distributor of controlled substances to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," and to "inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."  21 C.F.R. 1301.74(b).   The regulation further states that "[s]uspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

36.     In 2007, the DEA sent letters to every registered manufacturer or distributor of controlled substances, including (on information and belief) Purdue.   As stated in the letter, "the purpose of [the] letter [wa]s to reiterate the responsibilities of controlled substance manufacturers and distributors to inform the DEA of suspicious orders in accordance with 21 C.F.R. 1301.74(b)."

37.     In the letter, the DEA expressly warned that the regulation "requires that the

COMPLAINT - 10

registrant inform the local DEA Division Office of suspicious orders <u>when discovered</u> by the registrant." The DEA also warned that "[r]egistrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted."

38. In addition, the DEA warned that the "regulation specifically states that suspicious orders include orders of an unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a 'normal pattern' to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the order patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the relevant segment of the regulated industry."

C. **Purdue Knowingly, Recklessly, and/or Negligently Supplies OxyContin to Drug Rings, Pill Mills, and Other Dealers for Illegal Diversion in Everett.**

39. Despite federal, state, and local regulations, and Purdue's own agreement in the Consent Judgment, Purdue deliberately and repeatedly chose to maximize its profits at the expense of the welfare of Everett and its citizens.

40. On information and belief, Purdue knowingly, recklessly, and/or negligently supplied suspicious quantities of OxyContin to obviously suspicious physicians and pharmacies in Everett (and other areas within the State of Washington) for the illegal diversion of OxyContin within Everett, without disclosing suspicious orders as required by regulations. As part of its

COMPLAINT - 11

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

wrongful pattern and practice, Purdue also circumvented its obligations by enabling and/or failing to prevent the illegal diversion of OxyContin into the black market, including through drug rings, pill mills, and other dealers in Everett, with actual knowledge and/or reckless or negligent disregard that its highly addictive pills would be illegally trafficked and abused.

41.    For example, in approximately 2008 a criminal drug ring formed in Los Angeles, California with the objective of obtaining massive amounts of OxyContin and distributing OxyContin for illegal use, which distribution ultimately included black market sales and other dissemination in Everett. Specifically, the drug ring formed a clinic called Lake Medical to use as a front for its racketeering operation. The drug ring recruited several physicians and other staff to purportedly "practice" at Lake Medical.

42.    The drug ring also employed "cappers" and "runners" to recruit and transport phony patients, including homeless individuals, to Lake Medical. These individuals had no legitimate medical need for OxyContin. At the clinic, the purported medical staff would generate a bogus medical record and would then prescribe very powerful doses of OxyContin, particularly the 80 milligram dose, which was referred to on the street as "80s" and was favored on the black market among drug abusers, but only very rarely prescribed by legitimate doctors to actual patients.

43.    The phony patients were shuttled to one of several Los Angeles area pharmacies to obtain the OxyContin. The drug ring kept the OxyContin and made a small cash payment or other consideration to the phony patients. The drug ring distributed the OxyContin to various places around the country, including in Everett, through gang networks and other means.

44.    In particular, a drug dealer named Jevon Lawson ("Lawson"), who had moved to Everett from Southern California, acquired substantial quantities of OxyContin from the drug ring. On information and belief, Lawson's source in the drug ring would arrange to have the OxyContin pills transported to the State of Washington. The OxyContin was then ultimately disseminated to, among others, drug abusers in Everett.

COMPLAINT - 12

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

45.     The drug ring and the associated pharmacies made massive orders of OxyContin, which were completely out of line with the typical volume of orders for legitimate medical uses. And these atypical orders were tracked by Purdue, which had access to highly detailed prescription ordering data.  Through its monitoring system, Purdue detected, or at very least should have detected, the suspicious nature of the Lake Medical orders.

46.     In fact, since at least 2002, Purdue has collected, tracked, and monitored extensive data concerning suspicious physicians and pharmacies.  On information and belief, Purdue's database contains a list of more than 1,800 doctors, who Purdue suspected of recklessly prescribing OxyContin for drug dealers or addicts.  Purdue calls that list "Region Zero."

47.     In 2008, Purdue added the name of at least one of Lake Medical's physicians, Eleanor Santiago ("Santiago"), to Region Zero.  Shortly after Lake Medical had opened, Purdue was already tracking and suspicious of the enormous volume of prescriptions for 80s (*i.e.*, 80-milligram OxyContin pills) written by Santiago.  On information and belief, at nearly the same time that Purdue added Santiago to Region Zero, a pharmacist informed Purdue that Lake Medical was exploiting homeless individuals to acquire prescriptions for OxyContin.

48.     Other pharmacists also provided similar information to Purdue.  On information and belief, Purdue received more than 10 reports that abnormal and suspicious OxyContin prescriptions were being written at Lake Medical.  Those additional notifications were provided to Purdue in the months shortly after Purdue had already red-flagged Santiago by adding her name to Region Zero.

49.     In addition, in 2009, a District Manager for Purdue visited Lake Medical to investigate the suspicious volume of prescriptions for OxyContin.  The District Manager for Purdue immediately concluded the clinic was a front for a criminal operation by an organized drug ring and was "clearly diversion."  That District Manager also instantly recognized that it was too dangerous even to be present at the clinic.

50.     In an email dated September 1, 2009, the District Manager told Purdue that the

COMPLAINT - 13

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

DEA should be contacted:

-----Original Message-----
From: Ringler, Michele
Sent: Tuesday, September 01, 2009 7:24 PM
To: Crowley, Jack
Cc: Limer, Gina; Taggart, Bruce
Subject: RE: RE: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Jack,

Thank you. The fires are actually very close to where I live, but my immediate neighborhood
has not had to evacuate. The air quality is terrible and they are anticipating that it will
take 2 weeks to put the fires out!

I'm glad to hear that the wholesaler is not going to be selling to this pharmacy, but I'm not
sure why they are going to call on those doctors. I think it is very dangerous for the
wholesaler to call on this clinic. I'm also very concerned that the owner of St. Paul's
Pharmacy is going to say something to these physicians that he was paid a visit by the Purdue
reps. This is clearly diversion. Shouldn't the DEA be contacted about this?

Michele

51.     The District Manager also sent additional emails to Purdue's executives warning

that she was "very certain" that "this is an organized drug ring" and strenuously urged Purdue to

contact the DEA:

-----Original Message-----
From: Ringler, Michele
Sent: Wednesday, September 02, 2009 1:56 AM
To: Crowley, Jack
Cc: Limer, Gina; Taggart, Bruce
Subject: RE: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Jack,

Thanks for all of the information. My concern with wholesalers going to this clinic is that if
they have no experience with this type of situation, it could be very dangerous. Obviously, it
is their prerogative to do so, but when I went to the clinic with my rep, it was packed with a
line out the door, with people who looked like gang members. I feel very certain that this is
an organized drug ring and when these doctor's get cut off, the people behind them are going
to be very angry. It just seems that trained professionals like the DEA would be better
equipped to do further investigation of this clinic. Hopefully the wholesalers will agree.

Thanks,

Michele

COMPLAINT - 14

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

52.     Based on, among other things, Purdue's own tracking system and investigation, as well as the numerous pharmacy notifications, Purdue had actual and/or constructive knowledge of, or recklessly and/or negligently disregarded, the fact that the OxyContin prescriptions by Lake Medical were fraudulent and that extraordinary quantities of OxyContin were being diverted.

53.     In fact, the Executive Director of Controlled Substance Act Compliance for Purdue admitted that a wholesaler had previously notified Purdue of the alarming circumstances, and that one of the suspect pharmacies was in Purdue's monitoring system:

```
-----Original Message-----
From: Crowley, Jack
Sent: Tuesday, September 01, 2009 7:07 PM
To: Ringler, Michele
Cc: Taggart, Bruce; Limer, Gina
Subject: FW: ███████████████

One final comment - the wholesaler brought St. Paul's to my attention first.

While St. Paul's Pharmacy is on our Order Monitoring System, our committee hadn't gotten
around to discussing it yet. We asked you for input the same day it was brought to our
attention.

Best regards,

Jack
```

54.     On information and belief, that same Executive Director referred to Purdue's tracking system and database as a "gold mine" and admitted that Purdue was easily able to identify the highly suspicious volume of prescriptions for 80s written by Lake Medical.

55.     Despite such knowledge, however, Purdue did not notify the DEA or other authorities.  Nor did Purdue stop the flow of OxyContin through Lake Medical.  Instead, Purdue intentionally, recklessly, and/or negligently allowed the flow of OxyContin to continue through Lake Medical and waited to provide information to authorities only after Lake Medical was shut

COMPLAINT - 15

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

down in 2010, and following the arrest of several of the key criminals in the drug ring at Lake Medical.  Numerous individuals have subsequently pled guilty or have been convicted in a federal criminal action filed in the Central District of California.

56.  In addition, Lawson was arrested, charged, and pled guilty to federal drug trafficking charges in the Western District of Washington.  On information and belief, by the time Lake Medical was closed, more than 1 million OxyContin pills had been diverted into the black market, on which Purdue earned in excess of $15 million.

57.  Lawson admitted to receiving many thousands of those OxyContin pills into the State of Washington and distributing them in Everett.  As a direct result of Purdue's misconduct, therefore, destructive quantities of OxyContin were illegally distributed in Everett through the Lake Medical drug ring, which Purdue itself called "clearly diversion."

58.  Unfortunately, the illegal diversion through the Lake Medical drug ring is merely one of numerous examples of Purdue's callous and unconscionable pattern and practices.

59.  On information and belief, Purdue also knowingly, recklessly, and/or negligently supplied suspicious quantities of OxyContin to obviously suspicious physicians and pharmacies in Everett (and other areas within the State of Washington), without disclosing suspicious orders as required by regulations and otherwise circumventing Purdue's obligations.

60.  For example, on information and belief, with actual knowledge and/or reckless or negligent disregard that its highly addictive pills would be illegally trafficked and abused, Purdue enabled and/or failed to prevent the illegal diversion of OxyContin through drug rings, pill mills, and other dealers in Everett.

61.  Purdue could have (and should have) reported and stopped the flow of OxyContin into the black market.  But Purdue intentionally, recklessly, and/or negligently failed to investigate, report, and halt suspicious orders.  Accordingly, as a direct result of Purdue's misconduct, substantial and dangerous quantities of OxyContin were illegally diverted to and in Everett.

COMPLAINT - 16

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

**D.**   **Purdue's Misconduct and Unfair Practices Cause Serious Harm to Everett, Significant Injury to Everett, Substantial Damages to Everett, and Sizeable Costs for Everett.**

62.     Everett and its residents have been damaged by Purdue's intentional, reckless, and/or negligent misconduct, including Purdue's failure to investigate, report, and halt suspicious orders of OxyContin.  The wrongful conduct by Purdue has caused and will continue to cause serious harm, significant injury, and substantial damages to Everett and its residents.

63.     On information and belief, numerous individuals within Everett became addicted to OxyContin.  Overdoses of OxyContin are (and were at all relevant times) all too common.  On information and belief, overdoses have also resulted in many deaths in Everett.

64.     OxyContin abuse has also led to a raft of other social and economic ills.  For example, the use and overdose of OxyContin endangers lives, requiring intervention by emergency medical services and/or the fire department.  Addicts often commit other crimes to raise money to fuel their addiction, requiring additional law enforcement activities and costs.  In fact, during all relevant times, OxyContin was a factor in a significant number of the crimes committed in Everett.  In addition, drug paraphernalia is often left on public properties, requiring cleanup.

65.     OxyContin is also a gateway drug for heroin, which provides a similar high at a cheaper street price.  The illegal diversion of OxyContin, therefore, has also resulted in heroin abuse in Everett, because many users who become addicted to OxyContin ultimately switch to heroin to feed their opioid addictions.  In other words, the heroin crisis that has gripped Everett is directly attributable to Purdue's wrongful and tortious conduct.

66.     Everett has incurred and will continue to incur sizeable costs in dealing with the OxyContin (and consequent heroin) abuse, addiction, and crime caused by Purdue, including the expenditure of substantial sums to address the social and economic impacts of the opioid epidemic in Everett.  For example, Everett has spent, and will need to continue to spend, significant money on law enforcement, prosecution, emergency medical services, prisons and

COMPLAINT - 17

jails, probation, and public works.  Other departments of Everett, including the municipal courts, fire department, and parks department, have also been forced to devote substantial time, money, and resources to the harms caused by Purdue.  Everett has also suffered lost economic opportunity as a result of Purdue's wrongdoing.

67.    In addition to the significant amounts of taxpayer dollars that Everett has already been forced to spend and will continue to be forced to spend, the cost to remedy and remediate the extensive damage imposed by Purdue on Everett is sizeable.  For example, substantial sums are needed for law enforcement, diversion programs, and emergency medical care to provide additional services beyond current operating budgets.  Significant and substantial sums are required to fund addiction treatment, detox and rehabilitation facilities, social services and housing, and prevention and education programs.

68.    Accordingly, Purdue has caused and will continue to cause serious harm, significant injury, and substantial damages to Everett.  As a direct result of Purdue's misconduct and unfair practices, therefore, Everett has incurred and will continue to incur sizeable costs.

## V.    CAUSES OF ACTION

### FIRST COUNT:  GROSS NEGLIGENCE

69.    Everett repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

70.    Purdue owed a duty of care to Everett, including to take reasonable precautions to prevent diversion of its highly addictive OxyContin into the hands of criminal drug traffickers and abusers.

71.    Purdue knew or should have known, and/or recklessly disregarded, that its OxyContin was being diverted to the black market and for illegal use.

72.    Purdue failed to exercise slight care to Everett, including by, *inter alia*, failing to take appropriate action to stop the diversion of OxyContin, including through the Lake Medical drug ring and other suspect physicians and/or pharmacies in Everett, despite Purdue's actual or

COMPLAINT - 18

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

1  constructive knowledge and/or reckless disregard; circumventing regulations, obligations, and its

2  own agreements and procedures; supplying OxyContin to obviously suspicious physicians and

3  pharmacies without disclosing suspicious orders; enabling or failing to prevent the illegal

4  diversion of OxyContin into the black market; failing to maintain effective controls against

5  diversion and failing to design, implement, and operate a system to disclose suspicious orders of

6  controlled substances as required by regulations; and/or failing to establish, implement, and

7  follow an OxyContin abuse and diversion detection program consisting of internal procedures

8  designed to identify potential abuse or diversion of OxyContin.

9      73.    As a direct, proximate, and foreseeable result of Purdue's gross negligence,

10  Everett has been damaged, suffered harm and injury, and has incurred (and will continue to

11  incur) significant costs.

12      74.    Accordingly, Everett is entitled to damages in an amount to be proven at trial.

### SECOND COUNT:  NEGLIGENCE

14      75.    Purdue owed a duty of care to Everett, including to take reasonable precautions to

15  prevent diversion of its highly addictive OxyContin into the hands of criminal drug traffickers

16  and abusers.

17      76.    Purdue breached its duty by, *inter alia*, failing to take appropriate action to stop

18  the diversion of OxyContin, including through the Lake Medical drug ring and other suspect

19  physicians and/or pharmacies in Everett, despite Purdue's actual or constructive knowledge

20  and/or reckless disregard; circumventing regulations, obligations, and its own agreements and

21  procedures; supplying OxyContin to obviously suspicious physicians and pharmacies without

22  disclosing suspicious orders; enabling or failing to prevent the illegal diversion of OxyContin

23  into the black market; failing to maintain effective controls against diversion and failing to

24  design, implement, and operate a system to disclose suspicious orders of controlled substances as

25  required by regulations; and/or failing to establish, implement, and follow an OxyContin abuse

26  and diversion detection program consisting of internal procedures designed to identify potential

COMPLAINT - 19

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

abuse or diversion of OxyContin.

77.     As a direct, proximate, and foreseeable result of Purdue's breach, Everett has been damaged, suffered harm and injury, and has incurred (and will continue to incur) significant costs.

78.     Accordingly, Everett is entitled to damages in an amount to be proven at trial.

### THIRD COUNT:  PUBLIC NUISANCE

79.     Everett repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

80.     Purdue manufactured, sold, promoted, and/or distributed OxyContin in a manner that created or participated in creating a public nuisance that is harmful and injurious to Everett and its residents.

81.     Purdue knowingly, intentionally, recklessly, and/or negligently, disseminated massive quantities of OxyContin to suspect physicians and pharmacies and into the black market, including the Lake Medical drug ring and other drug rings, pill mills, and dealers.

82.     Purdue also enabled and/or failed to prevent the illegal diversion of OxyContin into the black market, including through drug rings, pill mills, and other dealers in Everett, with actual knowledge, intent, and/or reckless or negligent disregard that such pills would be illegally trafficked and abused.

83.     Purdue's conduct annoys, injures, and/or endangers the comfort, repose, health, and safety of others.

84.     Purdue's conduct caused and continues to cause harm to Everett.

85.     Purdue's wrongful conduct has given rise to a public nuisance, including the unlawful availability and abuse of OxyContin and addiction within Everett.

86.     The rights, interests, and inconvenience to Everett and the general public far outweigh the rights, interests, and inconvenience to Purdue, which profited heavily from the illegal diversion of OxyContin.

COMPLAINT - 20

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

87.     Pursuant to Chapter 7.48 RCW and its inherent police powers, Everett is entitled to abate the public nuisance and to obtain damages occasioned by the public nuisance.

88.     Accordingly, Everett is entitled to injunctive or other equitable relief and/or damages in an amount to be proven at trial.

**FOURTH COUNT:  CONSUMER PROTECTION ACT**

89.     Everett repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

90.     Purdue engaged in unfair or deceptive acts or practices in violation of RCW 19.86 *et seq.* by, *inter alia*, supplying (and continuing to sell) OxyContin to obviously suspicious physicians and pharmacies to generate huge profits for Purdue, despite actual or constructive knowledge from, and/or reckless or negligent disregard of, prescribing records, pharmacy orders, field reports from sales representatives, and Purdue's own surveillance operations, while failing to maintain effective controls against diversion and failing to design and operate a system to disclose suspicious orders of controlled substances as required by regulations, and/or failing to establish, implement and follow an OxyContin abuse and diversion detection program consisting of internal procedures designed to identify potential abuse or diversion of OxyContin, as agreed in its Consent Judgment.

91.     Purdue's unfair or deceptive acts or practices occurred in trade or commerce, and was and is capable of deceiving a substantial portion of the public.

92.     Purdue's unfair or deceptive acts or practices impact the public interest because such misconduct is capable of affecting consumers throughout the State of Washington and is capable of repetition.

93.     Purdue's unfair or deceptive acts or practices caused damages to Everett and Everett is entitled to an injunction to enjoin further violations and to recover actual damages and treble damages, along with reasonable attorney's fees and costs.

94.     Accordingly, Everett is entitled to actual damages and treble damages in amounts

COMPLAINT - 21

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

to be proven at trial, as well as reasonable attorney's fees and costs.

**FIFTH COUNT:  UNJUST ENRICHMENT**

95.     Everett repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

96.     Purdue was required to maintain effective controls against diversion and to design and operate a system to disclose suspicious orders of controlled substances.  Purdue also agreed to establish, implement, and follow an OxyContin abuse and diversion detection program consisting of internal procedures designed to identify potential abuse or diversion of OxyContin.

97.     Purdue induced Everett (as a municipality in the State of Washington) in relation to the enforcement of OxyContin as a controlled substance, but Purdue failed its obligations and circumvented its agreements, and Purdue has been unjustly enriched at the expense of Everett.

98.     Accordingly, Everett is entitled to damages in an amount to be proven at trial.

**SIXTH COUNT: PUNITIVE DAMAGES**

99.     Everett repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

100.    Everett requests punitive damages under the laws of the State of Connecticut. Purdue's principal place of business is located in the State of Connecticut.  On information and belief, Purdue's decision to supply OxyContin to obviously suspicious physicians and pharmacies and/or permit the illegal diversion of OxyContin into the black market, in order to maximize its own profits, occurred at its headquarters in the State of Connecticut.  The State of Connecticut, therefore, has a substantial interest in deterring Purdue's wrongful and egregious misconduct.

101.    In addition or in the alternative, Everett requests punitive damages under laws of the State of California.  At least for the Lake Medical drug ring, Purdue supplied OxyContin to physicians and pharmacies in the State of California that was (by Purdue's own words) "clearly diversion."  The State of California, therefore, has a substantial interest in deterring Purdue's

COMPLAINT - 22

KELLEY, GOLDFARB,
HUCK, ROTH & RIOJAS, PLLC
700 Fifth Avenue, Suite 6100
Seattle, Washington 98104
(206) 452-0260

1    wrongful and egregious misconduct.

2        102.    Accordingly, Everett is entitled to punitive damages in an amount to be

3    determined at trial.

4                              **PRAYER FOR RELIEF**

5        Wherefore, Everett respectfully asks this Court to award the following relief:

6        A.    For judgment against Purdue and an award of all compensatory damages allowed

7    by law, in an amount to be proven at trial;

8        B.    For an injunction and/or other equitable relief to prevent further misconduct and

9    unfair practices by Purdue;

10       C.    For treble damages pursuant to RCW 19.86.090;

11       D.    For punitive damages;

12       E.    For attorney's fees and costs pursuant to any applicable provision of law;

13       F.    For pre- and post-judgment interest as allowed by law;

14       G.    For leave to amend this Complaint as necessary; and

15       H.    For any other relief that the Court deems just and proper.

16

17    DATED this January 18, 2017.

18                          **Kelley, Goldfarb, Huck, Roth & Riojas, PLLC**

19

20                          Michael A. Goldfarb, WSBA No. 13492
                            Christopher M. Huck, WSBA No. 34104
21                          Kit W. Roth, WSBA No. 33059
                            R. Omar Riojas, WSBA No. 35400
22                          700 Fifth Avenue, Suite 6100
                            Seattle, Washington 98104
23                          Telephone:   (206) 452-0260
                            E-mail:      goldfarb@kelleygoldfarb.com
24                                       huck@kelleygoldfarb.com
                                         roth@kelleygoldfarb.com
25                                       riojas@kelleygoldfarb.com

26                          Attorneys for Plaintiff City of Everett

COMPLAINT - 23